UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIE BUTLER,

                              Plaintiff,

        v.

DR. ZAMILUS, N.A. MURRAY, and RN
GANNER

                              Defendants.

No. 14-CV-853 (KMK)

OPINION & ORDER

Appearances

Willie Butler
Beacon, NY
*Pro Se Plaintiff*

Samuel Yaggy, Esq.
Donald Nowve, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Willie Butler ("Plaintiff"), proceeding pro se, filed the instant Complaint (the

"Complaint") against Defendants Dr. Zamilus, N.A. Murray, and RN "Ganner" (collectively,

"Defendants") on February 5, 2014 pursuant to 42 U.S.C. § 1983, alleging that Defendants

violated his constitutional rights by failing to provide adequate medical care after removing an

ingrown toenail, failing to provide an open-toed medical shoe to protect his toe from infection,

and failing to issue a bus pass to Plaintiff.  (*See* Compl. (Dkt. No. 2) ¶ V.)  Before the Court is

Defendants' Motion for Summary Judgment (the "Motion") pursuant to Federal Rule of Civil

Procedure 56.  (Dkt. No. 92.)  For the reasons that follow, the Court grants the Motion.

I.  Background

A.  Factual Allegations

The following facts are taken from Defendants' Statement Pursuant to Local Rule 56.1 and the supporting documents offered by Defendants and Plaintiff.  (*See* Defs.' Statement Pursuant to Local Rule 56.1 ("Defs.' 56.1") (Dkt No. 94).)  Although Plaintiff has not offered a statement of undisputed facts pursuant to Local Rule 56.1, Plaintiff's failure to file such a statement does not "absolve[] the district court of even checking whether the citation [in the Local Rule 56.1 Statement] supports the assertion."  *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003).  Accordingly, the Court will examine the documents offered by Defendants in support of their statement pursuant to Local Rule 56.1.

On December 18, 2013, while incarcerated at Otisville Correctional Facility, Plaintiff was admitted to the infirmary complaining of pain emanating from an ingrown toenail on his left great toe.  (*See* Defs.' 56.1 ¶ 1; Decl. of Samuel Yaggy in Supp. of Defs.' Mot. for Summ. J. Based on Qualified Immunity ("Yaggy Decl.") Ex. A ("Medical Records"), at MED 167–68 (Dkt. No. 96).)[1]  The next day, Defendant Dr. Gaetan Zamilus ("Dr. Zamilus") examined Plaintiff and determined that the toenail should be removed.  (*See* Defs.' 56.1 ¶ 2; Yaggy Decl. Ex. B ("Pl.'s Dep. Tr."), at 8; Decl. of Gaetan Zamilus in Supp. of Defs.' Mot. for Summ. J. ("Zamilus Decl.") ¶ 2.)  Although the record includes a consent form signed by Plaintiff consenting to Dr. Zamilus's removal of the toenail, (*see* Defs.' 56.1 ¶ 2; Medical Records at MED 202), Plaintiff disputes that he signed any such form or ever consented to Dr. Zamilus removing the toenail, (*see* Pl.'s Dep. Tr. 22–23).  Nevertheless, Dr. Zamilus removed the toenail

---

[1] The Court cites to the "MED" page numbers located at the bottom of each page in Exhibit A to Samuel Yaggy's declaration.

and prescribed a ten day course of an antibiotic called Bactrim.  (*See* Defs.' 56.1 ¶¶ 2–3; Medical Records at MED 167, 198; Zamilus Decl. ¶ 2.)[2]

Although Plaintiff was initially scheduled to be discharged from the infirmary on December 20, 2013, he complained of pain and difficulty walking, and thereafter remained in the infirmary for an additional eight days.  (*See* Defs.' 56.1 ¶¶ 5–6; Medical Records at MED 35; Pl.'s Dep. Tr. 8.)  Plaintiff was given Tylenol and monitored by the medical staff.  (*See* Defs.' 56.1 ¶¶ 5–6; Medical Records at MED 35, 168, 171.)  On December 22, the medical staff observed redness on Plaintiff's left great toe.  (*See* Defs.' 56.1 ¶ 7; Medical Records at MED 171.)  On December 23, the medical staff noted that Plaintiff's wound was open to the air and was draining.  (*See* Defs.' 56.1 ¶ 8; Medical Records at MED 172.)  On December 25, the medical staff noticed some dried blood, some swelling in the nail bed of Plaintiff's great left toe, and some drainage, but no sign of an infection.  (*See* Defs.' 56.1 ¶ 10; Medical Records at MED 173.)  Plaintiff's wound was then lightly covered with gauze.  (*See* Defs.' 56.1 ¶ 10; Medical Records at MED 173.)

On December 26, Dr. Zamilus gave Plaintiff a "program restriction," effective until January 1, 2014.  (*See* Defs.' 56.1 ¶ 11; Medical Records at MED 200.)  The medical records indicate that Plaintiff expressed no complaints from December 23 to December 27, when he was released from the infirmary.  (*See* Defs.' 56.1 ¶¶ 8–12; Medical Records at MED 173–74.)  On the day he was discharged, the medical records state that Plaintiff told medical staff that he was "good" and "want[ed] to get out of [the infirmary],"  (*see* Defs.' 56.1 ¶ 12; Medical Records at MED 174), but Plaintiff disputes this account, (*see* Pl.'s Resp. to Dr. Zamilus Mot. of Summ. J.

---

[2] Dr. Zamilus is licensed by New York State to practice family medicine and, as a result of this license, is allowed to perform ingrown toenail removal procedures.  (*See* Defs.' 56.1 ¶ 4; Zamilus Decl. ¶ 2.)

Rule 56 ¶ 8 (Dkt. No. 107)).  Plaintiff testified that on the day he was discharged, he indicated to

Dr. Zamilus that he could not use the medical boot provided because of the gauze on his great

left toe and that he therefore needed a different medical boot.  (*See* Pl.'s Dep. Tr. 8.)  Plaintiff

requested a bus pass from Dr. Zamilus, but Dr. Zamilus declined to issue him one.  (*See id.*; *see*

*also* Zamilus Decl. ¶ 4.)  Later that day, on December 27, 2013, Plaintiff filed a grievance related

to Dr. Zamilus's treatment of his toe.  (*See* Defs.' 56.1 ¶ 13; Yaggy Decl. Ex. C ("Grievance

Filings"), at unnumbered 1.)

On December 30, 2013, Plaintiff returned to the infirmary and was seen by Nurse D.

Ramos and Dr. Ferdous.  (*See* Defs.' 56.1 ¶ 14; Medical Records at MED 34; *see also* Pl.'s Dep.

Tr. 9.)  Nurse Ramos noted a "slight yellowish drainage" from Plaintiff's left great toe, but no

redness, swelling, or odor.  (*See* Defs.' 56.1 ¶ 14; Medical Records at MED 34.)  Dr. Ferdous

examined Plaintiff, found no discharge, but nevertheless extended Plaintiff's program restriction

for an additional two weeks.  (*See* Defs.' 56.1 ¶ 14; Medical Records at MED 34, 199.)

On January 7, 2014, Plaintiff again returned to the infirmary, complaining that his toe

was bleeding.  (*See* Defs.' 56.1 ¶ 15; Medical Records at MED 33; Pl.'s Dep. Tr. 14.)  Defendant

Nurse Susan Gaynor ("Gaynor"), mistakenly identified as "Ganner" in the Complaint, examined

Plaintiff, but found no bleeding or signs of infection.  (*See* Defs.' 56.1 ¶ 15; Medical Records at

MED 33; Decl. of Susan Gaynor in Supp. of Defs.' Mot. for Summ. J. ("Gaynor Decl.") ¶ 2

(Dkt. No. 99).)  Gaynor discharged Plaintiff after giving him more gauze for his toe.  (*See* Defs.'

56.1 ¶ 15; Gaynor Decl. ¶ 2.)  Later that same day, Dr. Zamilus referred Plaintiff to a podiatrist.

(*See* Defs.' 56.1 ¶ 15; Medical Records at MED 97.)  Plaintiff supplemented his earlier-filed

grievance on January 7, 2014, prior to his grievance hearing, with information regarding the

examination by Gaynor.  (*See* Defs.' 56.1 ¶ 13; Grievance Filings at unnumbered 3.)

On January 9, 2014, at Plaintiff's grievance hearing, Defendant Nurse Administrator Rhonda Murray ("Murray") examined Plaintiff and detected no signs of infection and no discharge from Plaintiff's left great toe.  (*See* Defs.' 56.1 ¶ 16; Decl. of Rhonda Murray in Supp. of Defs.' Mot. for Summ. J. ("Murray Decl.") ¶ 2 (Dkt. No. 98).)  Plaintiff claims that Murray "acknowledge[d] that [he] did have an infection because these were [Murray's] words," (Pl.'s Dep. Tr. 9), but Murray denies ever making such a statement, (*see* Murray Decl. ¶ 2).  Murray advised Plaintiff to come to sick call if he began showing signs of an infection.  (*See* Defs.' 56.1 ¶ 16; Murray Decl. ¶ 2.)

On January 13, 2014, Plaintiff went to the infirmary and was examined by Nurse A. Dah.  (*See* Defs.' 56.1 ¶ 17; Medical Records at MED 33.)  Nurse Dah detected no sign of an infection, but extended Plaintiff's program restriction for one day.  (*See* Defs.' 56.1 ¶ 17; Medical Records at MED 33, 196.)

On January 14, 2014, Plaintiff was again seen by Dr. Zamilus in the infirmary after complaining of pain in his left great toe.  (*See* Defs.' 56.1 ¶ 18; Medical Records at MED 32.) Dr. Zamilus detected no infection, pus, or drainage.  (*See* Defs.' 56.1 ¶ 18; Pl.'s Dep. Tr. 10; Zamilus Decl. ¶ 6.)  Dr. Zamilus extended Plaintiff's program restriction until January 19, 2014. (*See* Defs.' 56.1 ¶ 18; Medical Records at MED 195.)  Plaintiff returned to the infirmary on January 17, 2014 complaining of drainage from his left great toe, but Nurse Dah again noted that she detected no drainage.  (*See* Defs.' 56.1 ¶ 19; Medical Records at MED 32.)  Nurse Dah also described Plaintiff as "very impatient" and noted that he "[didn't] want to listen."  (Medical Records at MED 32.)  On January 22, Plaintiff's program restriction was extended until January 29, 2014.  (*See* Defs.' 56.1 ¶ 20; Medical Records at MED 31, 194.)  On January 27, Plaintiff's

program restriction was again extended, this time until February 13, 2014.  (*See* Defs.' 56.1 ¶ 20;

Medical Records at MED 31, 193.)

On January 29, 2014, Plaintiff met with podiatrist Dr. Andrew Shapiro.  (*See* Defs.' 56.1

¶ 21; Medical Records at MED 97.)  On January 30, Plaintiff met with Dr. Zamilus to follow up

on the consultation with Dr. Shapiro.  (*See* Defs.' 56.1 ¶ 21; Medical Records at MED 31; Pl.'s

Dep. Tr. 13–14.)  Dr. Zamilus detected no signs of infection and concluded that Plaintiff required

no further restriction from programs and did not require a bus pass.  (*See* Defs.' 56.1 ¶ 21;

Zamilus Decl. ¶ 7; *see also* Pl. Dep. Tr. 14.)  After Plaintiff left the infirmary, the nursing staff

spoke with Dr. Shapiro, who indicated that Plaintiff's left great toe was fine, but that he needed

to have his right great toenail removed as well.  (*See* Defs.' 56.1 ¶ 21; Zamilus Decl. ¶ 8.)

On February 4, 2014, Dr. Zamilus met with Plaintiff for a follow-up appointment,

wherein he explained that he was referring Plaintiff to Dr. Shapiro for the procedure on his right

great toe.  (*See* Defs.' 56.1 ¶ 22; Medical Records at MED 30, 96; Zamilus Decl. ¶ 8.)  Plaintiff

again requested a bus pass, but Dr. Zamilus detected no signs of an infection and again denied

the request.  (*See* Defs.' 56.1 ¶ 22; Medical Records at MED 30; Zamilus Decl. ¶ 8.)  On

February 6, 2014, Plaintiff requested an appointment for a "reasonable accommodation due to

[his] foot problem."  (*See* Defs.' 56.1 ¶ 23; Medical Records at MED 29.)  On February 12,

2014, Dr. Davis examined Plaintiff and determined that Plaintiff did not require a bus pass.  (*See*

Defs.' 56.1 ¶ 23; Medical Records at MED 29; *see also* Pl.'s Dep. Tr. 10 ("[Dr. Davis's] words

to me was he cannot override the doctor that's inside this facility because that is his

supervisor.").)

On April 2, 2014, Plaintiff met with Dr. Shapiro to discuss the operation on his right great toenail.  (*See* Defs.' 56.1 ¶ 24; Medical Records at MED 96.)  Plaintiff declined the procedure.  (*See* Defs.' 56.1 ¶ 24; Medical Records at MED 96.)

On April 9, 2014, Plaintiff was examined by Dr. Ferdous, who noted no discharge from Plaintiff's left great toe and no swelling.  (*See* Defs.' 56.1 ¶ 25; Medical Records at MED 27.)  Gaynor alleges that Plaintiff was uncooperative and disruptive with her, and that Plaintiff would have received a misbehavior report had he not apologized for his behavior.  (*See* Defs.' 56.1 ¶ 25; Gaynor Decl. ¶ 4.)  Plaintiff disputes this account, noting that "if you get into [any] type of situation around any of these staffs, they gonna lock you up, man."  (Pl.'s Dep. Tr. 17.)

### B.  Procedural History

Plaintiff filed the Complaint on February 5, 2014, seeking $5,500 in compensatory damages.  (*See* Compl. ¶ V.)  Service was effected on Gaynor and Murray on May 15, 2014, (*see* Dkt. Nos. 20, 22), and those Defendants filed an Answer to the Complaint on September 17, 2014, (*see* Dkt. No. 36).  Service was effected on Dr. Zamilus on February 19, 2015, (*see* Dkt. No. 59), and Dr. Zamilus filed an Answer on March 23, 2015, (*see* Dkt. No. 61).  The Court set a discovery schedule on May 1, 2015, (*see* Dkt. (minute entry for May 1, 2015)), and Magistrate Judge Paul E. Davison oversaw discovery, (*see* Order Referring Case to Magistrate Judge (Dkt. No. 66)).  After a pre-motion conference was held, (*see* Dkt. (minute entry for Dec. 9, 2015)), the Court set a briefing schedule for the Summary Judgment Motion, (*see* Motion Scheduling Order (Dkt. No. 88)).  Defendants filed the Motion and supporting papers on January 29, 2016.  (*See* Dkt. Nos. 92–101.)  Plaintiff filed responses to each Defendant on February 19, 2016, (*see* Dkt. Nos. 107–09), and also filed an affidavit in opposition to the Motion, (*see* Pl.'s Aff. in Opp'n to Defs.' Mot. for Summ. J. Pursuant to Rule 56 ("Pl.'s Opp'n") (Dkt. No. 110)).  Defendants filed

their reply on March 18, 2016.  (*See* Defs.' Reply Mem. of Law (Dkt. No. 111).)  Plaintiff filed a surreply on March 22, 2016, (*see* Dkt. No. 114), which was accepted for filing on March 30, 2016, (*see* Dkt. No. 113).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical'

possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis and internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Finally, the Second Circuit has instructed that "special solicitude" should be afforded a pro se litigant on a motion for summary judgment, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *see also Berry*, 137 F. Supp. 3d at 522 (same), whereby a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (italics and internal quotation marks omitted).

B.  Materials Considered

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . .");  *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge");  *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks omitted));  *Zigmund v. Foster*, 106 F. Supp. 2d 352, 356 (D. Conn. 2000) (noting that "[a]n affidavit in which the plaintiff merely restates the conclusory allegations of the complaint" is insufficient to support a motion for summary judgment).

In addition, "a pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Berry*, 137 F. Supp. 3d at 519 (internal quotation marks omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("The non-moving party may not rely on conclusory allegations or unsubstantiated speculation.").  The Court, therefore, disregards assertions in Plaintiff's opposition papers that are not supported by admissible evidence.  *See Mitchell v. Igoe*, No. 06-CV-186, 2009 WL 3165659, at *8 (N.D.N.Y. Sept. 25, 2009) ("Statements contained within a memorandum . . . without proper evidentiary

support, do not constitute competent evidence upon which a court may base its ruling upon a motion for summary judgment."), *aff'd*, 407 F. App'x 536 (2d Cir. 2011).

C.  Analysis

It is unclear what grounds for relief Plaintiff intends to assert in this Action.  Although Plaintiff brings this action pursuant to 42 U.S.C. § 1983, (*see* Compl. 1), Plaintiff asks the Court to "penalize . . . [D]efendants for . . . medical malpractice," (*see id.* ¶ V), a claim not cognizable under § 1983, *see* 42 U.S.C. § 1983 (providing a cause of action for any person deprived of "any rights, privilege, or immunities secured by the Constitution and laws"); *see also Gonzalez v. Wright*, 665 F. Supp. 2d 334, 347 (S.D.N.Y. 2009) ("Malpractice claims cannot be brought under [§] 1983, because they sound in negligence, and mere negligence does not rise to the level of a constitutional tort." (internal quotation marks omitted)).  Plaintiff also suggests that the alleged misconduct was "spitefully done after [Defendants] got wind of [Plaintiff] placing a grievance against medical staff."  (Compl. ¶ V.)  Construing Plaintiff's allegations and subsequent filings to "raise the strongest arguments that they suggest," *Triestman*, 470 F.3d at 474 (italics and internal quotation marks omitted), the Court considers Plaintiff to be raising an Eighth Amendment deliberate indifference claim and a First Amendment retaliation claim.  The Court addresses each claim in turn.

1.  Eighth Amendment Deliberate Indifference

Plaintiff alleges that he received improper medical care when Defendants failed to properly treat Plaintiff's toe and failed to provide appropriate medical accommodations, such as a modified walking boot or a bus pass.  (Compl. ¶ V.)

Defendants argue that the record evidence contradicts Plaintiff's claim that the treatment of his great left toe was inadequate, pointing to the medical files and declarations of Defendants

11

showing that no medical personnel who examined Plaintiff detected any signs of infection or bleeding.  (*See* Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 8 (Dkt. No. 93).)  Defendants further argue that even assuming the treatment of Plaintiff's toe was inadequate, the alleged toe injury was not sufficiently serious for Eighth Amendment purposes, (*see id.* at 9–10), and there is no evidence that Defendants were deliberately indifferent to Plaintiff's medical needs, (*see id.* at 10–11).

### a.  Applicable Law

"The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners."  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted).  "There are two elements to a claim of deliberate indifference to a serious medical condition."  *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).  "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious."  *Spavone*, 719 F.3d at 138 (internal quotation marks omitted).  Under this objective requirement, a court must inquire first, "whether the prisoner was actually deprived of adequate medical care," and second, "whether the inadequacy in medical care is sufficiently serious."  *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006).  Under the first inquiry, adequate medical care is reasonable care such that "prison officials who act reasonably cannot be found liable."  *Farmer v. Brennan*, 511 U.S. 825, 845 (1994).  Under the second inquiry, the Court examines "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467 F.3d at 280.  As part of this objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).  "There is no settled, precise metric to guide a court in its estimation of the seriousness of

a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).

Nevertheless, the Second Circuit has presented "a non-exhaustive list" of factors to consider:

"(1) whether a reasonable doctor or patient would perceive the medical need in question as

'important and worthy of comment or treatment,' (2) whether the medical condition significantly

affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.* (quoting

*Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *see also Morales v. Fischer*, 46 F.

Supp. 3d 239, 247 (W.D.N.Y. 2014) (same).

      Courts distinguish between situations where no medical attention is given and situations

where medical attention is given, but is objectively inadequate.  In the former, the Court need

only "examine whether the inmate's medical condition is sufficiently serious."  *Salahuddin*, 467

F.3d at 280.  In the latter, however, the inquiry is "narrower"; for example, "if the prisoner is

receiving on-going treatment and the offending conduct is an unreasonable delay or interruption

in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in

treatment rather than the prisoner's underlying medical condition alone.'" *Id.* (quoting *Smith v.

Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)).

      "The second requirement is subjective: the charged officials must be subjectively reckless

in their denial of medical care."  *Spavone*, 719 F.3d at 138.  Here, the inquiry is whether

defendants "knew of and disregarded an excessive risk to [a plaintiff's] health or safety" while

"both aware of facts from which the inference could be drawn that a substantial risk of serious

harm existed, and also drew the inference."  *Caiozzo*, 581 F.3d at 72 (alterations and internal

quotation marks omitted); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and he [or she] must also draw the inference.").  "Deliberate indifference is a mental state

equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (internal quotation marks omitted); *see also Gladden v. City of New York*, No. 12-CV-7822, 2013 WL 4647193, at *2 (S.D.N.Y. Aug. 29, 2013) ("To meet the subjective element, the plaintiff must show that the defendant acted with more than mere negligence, and instead knew of and disregarded an excessive risk to inmate health or safety." (internal quotation marks omitted)).  In contrast, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., . . . a conscious disregard of a substantial risk of serious harm."  *Chance*, 143 F.3d at 703 (internal quotation marks omitted).  Moreover, "mere disagreement over the proper treatment does not create a constitutional claim," and "so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Id.*; *see also Crique v. Magill*, No. 12-CV-3345, 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention . . . does not constitute deliberate indifference.").

Defendants argue that the evidence is insufficient to meet any step in this analysis.

### b.  Application

Under the "objective" prong of the Eighth Amendment analysis, the first question is whether Plaintiff was deprived of objectively adequate medical care.  Examining the record evidence, the Court concludes that he was not.

Plaintiff first appears to contend that Dr. Zamilus was not qualified to perform the operation on Plaintiff's great left toe.  (*See* Pl.'s Opp'n ¶ 4; Pl.'s Opp'n Ex. 2, at unnumbered 5.) This allegation is unsubstantiated by the record.  For example, Plaintiff's assertion that Dr.

Zamilus was not qualified to perform the procedure is based on hearsay from Dr. Shapiro, (*see*

Pl.'s Opp'n Ex. 2, at unnumbered 5), who has not offered any testimony in this matter.  Because

the alleged statement from Dr. Shapiro that Dr. Zamilus was not qualified to perform the surgery

is offered for its alleged truth, and because there is no hearsay exception or exclusion that would

allow the testimony to be entered at trial, *see* Fed. R. Evid. 801(a)–(c), 802, Plaintiff's statement

regarding the qualifications of Dr. Zamilus to perform the procedure on Plaintiff's left great toe

does not bear on the Motion, *see Nora Beverages*, 164 F.3d at 746.  Furthermore, the admissible

record evidence indicates that Dr. Zamilus was, in fact, qualified to perform the operation.  (*See*

Grievance Filings at unnumbered 11; Zamilus Decl. ¶ 3.)  Accordingly, this Court has no basis

upon which to find that Dr. Zamilus was unqualified to perform the procedure in question.

  With regard to the adequacy of Plaintiff's medical care, Plaintiff does not claim that he

received *no* medical attention; indeed, Plaintiff was seen by medical personnel no less than 20

times in the four months following his operation.  (*See* Medical Records at MED 26–34.)[3]

Rather, Plaintiff appears to contend that the operation and the treatment thereafter were

objectively unreasonable and contributed to an eventual infection of his toe.  (*See* Pl.'s Opp'n

¶¶ 3–6.)  But beyond subjective claims of pain in his left great toe, (*see, e.g.*, Medical Records at

MED 31–33), Plaintiff offers no objective evidence that his left great toe required any medical

attention beyond the regular examinations and prescriptions he received.  Additionally, of the at

least eight medical professionals who examined Plaintiff's great left toe after the operation, not a

---

[3] Plaintiff's suggestion that "[D]efendants attempted to falsify information in Plaintiff's Medical Records," (Pl.'s Opp'n ¶ 10), hardly warrants discussion.  That Plaintiff disputes the observations and recommendations of the various medical personnel who examined him does not give credence to the serious accusation levied here that medical records submitted under penalty of perjury were falsified or otherwise altered.  Simply put, Plaintiff does not offer any evidentiary support for this claim.

single one indicated in the medical records that Plaintiff's toe was infected. (*See* Medical Records at MED 31–33, 95–97.) And contrary to Plaintiff's assertion that Nurse Ramos, who examined Plaintiff on December 30, 2013, indicated that Plaintiff's toe exhibited a "very nasty odor," (Pl.'s Opp'n ¶ 5), the record reflects, in fact, that Nurse Ramos indicated there was no "redness," "swelling," or "odor," and only noted Plaintiff's complaint that his toe was very painful and remarked on Plaintiff's "steady[,] slow gait," (Medical Records at MED 34). None of these observations indicates an infection, much less one that required immediate medical attention.

Moreover, Plaintiff's assertion that he was deprived of adequate medical care because Defendants denied him a bus pass and a modified walking boot is not supported by the evidence. Beyond his own conviction that he was entitled to a bus pass, Plaintiff offers no evidence that a bus pass was needed or that his medical condition was exacerbated by having to walk. Absent evidence that the bus pass was required as a matter of medical necessity, there is no basis to second-guess Defendants' medical judgment on this issue. *See Muhammad v. Francis*, No. 94-CV-2244, 1996 WL 657922, at *7 (S.D.N.Y. Nov. 13, 1996) ("[The] defendants' denials of [the] plaintiff's requests for . . . bus passes . . . were well within the parameters of medical judgment. [The] [d]efendants' medical decisions not to grant [the] plaintiff's requests do not demonstrate cruel and unusual punishment."); *Johnson v. Dep't of Corr.*, No. 93-CV-8365, 1994 WL 665934, at *4 (S.D.N.Y. Nov. 28, 1994) ("The record shows that [the plaintiff's] request for a bus pass was denied by prison officials . . . after an examination and observation that he was in no acute distress ambulating well with no assistance." (alteration and internal quotation marks omitted)). And Plaintiff has adduced no evidence, and indeed, appears to have abandoned his claim, that a modified walking boot was necessary to accommodate his medical condition.

Even assuming Plaintiff was deprived of adequate medical care, Plaintiff has not met the second requirement under the objective prong of the Eighth Amendment analysis; that is, Plaintiff has not shown that the deprivation of adequate medical care was sufficiently serious to implicate the Eighth Amendment.  In general, "subjective complaints of pain are not sufficient to satisfy [the serious medical need] standard."  *Thomas v. Nassau Cty. Corr. Ctr.*, 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003); *see also Evan v. Manos*, 336 F. Supp. 2d 255, 260 (W.D.N.Y. 2004) (holding that "an assertion of pain sensation alone, unaccompanied by any large medical complications, does not amount to a serious medical need under the Eighth Amendment" (alteration and internal quotation marks omitted)).  Plaintiff contends that his foot became infected with "[y]ellow [d]rainage," (Pl.'s Opp'n ¶ 1), thus necessitating additional medical attention.  But while the record does reflect that Nurse Ramos detected some "yellowish drainage," (Medical Records at MED 34; Pl.'s Dep. Tr. 9), no medical professional who examined Plaintiff detected an infection of any kind, (*see* Medical Records at MED 26–34).  And although Plaintiff insists otherwise, (*see* Pl.'s Dep. Tr. 9), there is no evidence supporting Plaintiff's claim that Murray or any other medical professional stated at Plaintiff's grievance hearing that Plaintiff had an infection, (*see* Grievance Filings at unnumbered 11).  Even taking as true Plaintiff's assertion that Murray indicated at the grievance hearing that Plaintiff had an infection, it is undisputed that Murray never offered any opinion that Plaintiff's alleged infection was serious, that it had been exacerbated by Dr. Zamilus's failure to provide adequate medical treatment or provide a bus pass, or that Dr. Zamilus's treatment of Plaintiff's toe was deficient in any way.

Finally, even were the Court to assume that Defendants rendered insufficient medical attention and that Plaintiff's condition was serious enough to implicate the Eighth Amendment,

there is no evidence in the record suggesting that Defendants acted "with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Walker*, 717 F.3d at 125 (alteration and internal quotation marks omitted).  Even if Plaintiff is correct that his great left toe was infected, there is no indication that any of Defendants knew of such an infection. *See Caiozzo*, 581 F.3d at 72 (finding the plaintiff failed to establish deliberate indifference where "[m]ost of the evidence offered . . . was in support of the argument that [the defendant] *should have* been aware that [the plaintiff] was in immediate danger," not "that [the defendant] was actually aware of that immediate danger" (emphasis in original)); *see also Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("A prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety . . . .'" (quoting *Farmer*, 511 U.S. at 837); *Maccharulo v. Gould*, 643 F. Supp. 2d 587, 599 (S.D.N.Y. 2009) (same).  Absent evidence that Defendants knew of a serious medical condition and failed to act on it, Plaintiff cannot establish deliberate indifference.  And the record reflects that Defendants continued to examine Plaintiff and treat him throughout the time period in question, (*see* Medical Records at MED 26–34), further undermining the notion that Defendants were deliberately indifferent to Plaintiff's complaints.  *See, e.g.*, *Morrison v. Mamis*, No. 08-CV-4302, 2008 WL 5451639, at *8 (S.D.N.Y. Dec. 18, 2008) (no deliberate indifference where "nurses dispensed medicine to [the plaintiff] and responded to his complaints almost every day"), *adopted by* 2009 WL 2168845 (S.D.N.Y. July 20, 2009); *Abney v. McGinnis*, No. 01-CV-8444, 2007 WL 844675, at *3 (S.D.N.Y. Mar. 16, 2007) (no deliberate indifference where the orthotics specialist met with the plaintiff 13 times within an almost two year period); *Rivera v. Goord*, 253 F. Supp. 2d 735, 755 (S.D.N.Y. 2003) (no deliberate indifference where the plaintiff "was frequently examined and treated for various conditions by a

total of 21 different doctors"); *see also Hathaway*, 99 F.3d at 553 ("[M]ere medical malpractice is not tantamount to deliberate indifference . . . . (internal quotation marks omitted)).

Put simply, Plaintiff has adduced no evidence, beyond his own self-serving assertions, that Defendants rendered inadequate medical care, that their actions caused Plaintiff serious medical injury, or that they acted with deliberate indifference.  As the burden of proof is on Plaintiff, summary judgment is appropriate for Defendants on Plaintiff's Eighth Amendment claim.

### 2.  First Amendment Retaliation

Plaintiff alleges that Defendants acted "spitefully" after getting "wind of [Plaintiff] placing a grievance against medical staff."  (Compl. ¶ V.)  The Court construes this as a claim for retaliation in violation of the First Amendment.  With regard to Dr. Zamilus, Plaintiff alleges that Dr. Zamilus retaliated by failing to issue a bus pass, (*see* Pl.'s Dep. Tr. 60), failing to properly examine his foot following the procedure, (*see id.* at 16, 31), threatening to transfer him out of the facility, (*see* Compl. Ex. 2, at unnumbered 4), removing Plaintiff's program restriction, (*see id.*; Pl.'s Dep. Tr. 14, 53), and instructing Gaynor and Murray to withhold medical care, (Pl.'s Dep. Tr. 73).  With respect to Gaynor and Murray, Plaintiff makes no specific allegation that they acted out of retaliation, but the Court will construe Plaintiff's arguments as to the allegedly inadequate medical care and accommodations provided by Gaynor and Murray as allegations that they provided inadequate care out of retaliation for Plaintiff's grievance filed against Dr. Zamilus on December 7, 2013, supplemented on January 7, 2014 with allegations against Gaynor.  (*See* Grievance Filings at unnumbered 1, 3.)

Defendants argue that no admissible evidence indicates that Dr. Zamilus acted out of retaliation or instructed Gaynor or Murray to provided inadequate medical care.  (*See* Defs.'

Mem. 13–14.)  Defendants point out that the record evidence indicates no sign of an infection

and no need for a bus pass.  (*See id.*)  Moreover, Defendants argue, there is no causal connection

between the filing of the grievance and the allegedly adverse actions, as Dr. Zamilus has denied

any knowledge of the grievance.  (*See id.* at 14 (citing Zamilus Decl. ¶ 11).)  With respect to

Gaynor and Murray, Defendants argue that there is no evidence, beyond Plaintiff's own

speculation, Gaynor even knew of the grievance, and that there is no evidence that Murray's

examination of Plaintiff at the grievance hearing was conducted with a retaliatory intent.  (*See*

Defs.' Mem. 15.)  Plaintiff offers only the conclusory response that "Dr. Zamilus was in fact

being spiteful and bias[ed] as w[ell as] retaliating."  (Pl.'s Opp'n ¶ 12.)

### a.  Applicable Law

A plaintiff asserting a First Amendment retaliation claim must allege "(1) that the speech

or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff,

and (3) that there was a causal connection between the protected speech and the adverse action."

*Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted).  Courts

are instructed to "approach prisoner retaliation claims with skepticism and particular care,

because virtually any adverse action taken against a prisoner by a prison official . . . can be

characterized as a constitutionally proscribed retaliatory act."  *Davis v. Goord*, 320 F.3d 346, 352

(2d Cir. 2003) (internal quotation marks omitted).  Accordingly, First Amendment retaliation

claims brought by prisoners must "be 'supported by specific and detailed factual allegations,' not

stated 'in wholly conclusory terms.'"  *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015)

(quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

### b.  Application

Plaintiff's filing of a grievance against Dr. Zamilus and Gaynor is protected conduct and therefore meets the first prong of the inquiry.  *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).  The Court will assume, without deciding, that the alleged failure to provide adequate medical care and accommodations meets the second prong.  However, Plaintiff has failed the third prong—whether there was a causal connection between the protected conduct and the adverse action—with respect to all three Defendants.

Regarding Plaintiff's claims against Dr. Zamilus, Plaintiff has established no causal connection between the allegedly adverse actions and the protected conduct.  Dr. Zamilus avers that he did not even know of the grievance filed against him by Plaintiff at the time he treated Plaintiff.  (*See* Zamilus Decl. ¶ 11.)  A plaintiff cannot sustain a claim of retaliation without proving that the defendant knew of the protected conduct, in this case, the grievance filed against Dr. Zamilus.  *See Wesley v. Kalos*, No. 97-CV-1598, 1997 WL 767557, at *5 (S.D.N.Y. Dec. 11, 1997) ("To establish a claim of retaliatory transfer requires [the plaintiff], at a minimum, to assert facts to show that the [d]efendants knew of [the plaintiff's] complaints prior to the transfer."); *see also Alston v. Pafumi*, No. 09-CV-1978, 2016 WL 81785, at *7 (D. Conn. Jan. 7, 2016) (granting partial summary judgment where the plaintiff identified "no record evidence from which a reasonable jury could infer that any other defendant was aware of [the plaintiff's] complaints"), *clarifying on denial of reconsideration*, 2016 WL 447423 (D. Conn. Feb. 4, 2016); *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his . . . grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not

named."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015).  Here, there is no evidence to contradict Dr. Zamilus's sworn statement that he was not aware of the grievance filed against him until he was informed by counsel in this case.  Plaintiff contends that "because all grievances that are placed against staff are invest[i]gated according to correctional law," it is not possible that Defendants did not have knowledge of the grievance.  (*See* Pl.'s Response to Defs.' Mot. in Reply Under Rule 56 for Summ. J. ¶ 1 (Dkt. No. 114).)  But the fact that Plaintiff's grievance was investigated by some member of the corrections department does nothing to prove that Dr. Zamilus, the named Defendant here, had actual knowledge of the grievance at all, let alone while he was still treating Plaintiff.  And there is nothing in the record indicating the grievance was sent to Dr. Zamilus or that he was otherwise made aware of the grievance.  In the absence of such evidence, Plaintiff's claim against Dr. Zamilus for retaliation under the First Amendment rests only on his conclusory assertions that Dr. Zamilus acted "spitefully."  (Compl. ¶ V.)  The First Amendment retaliation claim against Dr. Zamilus thus fails.

For the same reason, Plaintiff's claim against Gaynor must fall.  Gaynor, like Dr. Zamilus, has said she was unaware of any grievance filed against her or Dr. Zamilus until informed by counsel.  (*See* Gaynor Decl. ¶ 2.)  Again, that the grievance was investigated by the corrections department proves nothing about Gaynor's knowledge of the grievance, and there is no credible or admissible evidence in the record suggesting that Gaynor knew of the grievance.

With respect to Murray, there is no question that Murray was aware of the grievance filed against Dr. Zamilus and Gaynor, as she inspected Plaintiff's left great toe at his grievance hearing.  (*See* Murray Decl. ¶ 2.)  But Plaintiff never filed a grievance against Murray, and "[a]s a general matter, it is difficult to establish one defendant's retaliation for complaints against

another defendant." *Hare v. Hayden*, No. 09-CV-3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011); *see also Wright*, 554 F.3d at 274 (dismissing retaliation claim where "the only individual defendants named in the . . . [c]omplaint were Goord, McDermott, and Dirie, none of whom was alleged to have participated in th[e] [retaliatory] event"); *Henson v. Gagnon*, No. 13-CV-590, 2015 WL 9809874, at \*12 (N.D.N.Y. Dec. 10, 2015) ("The record is devoid of evidence . . . that supports [the] [p]laintiff's conclusory assertion that [the defendant] planted evidence and issued the [m]isbehavior [r]eport based upon evidence in retaliation for grievances [the] [p]laintiff had filed against other corrections officers."), *adopted by* 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016).  Moreover, Plaintiff's allegation that Dr. Zamilus instructed Murray and Gaynor to withhold adequate medical care and accommodations is contradicted by the record, (*see* Zamilus Decl. ¶ 10; Murray Decl. ¶ 6; Gaynor Decl. ¶ 5), and Plaintiff's unsupported assertions to the contrary, which are not based on first-hand knowledge, are insufficient to overcome summary judgment, *Berry*, 137 F. Supp. 3d at 519 ("[A] pro se party's bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment.").  There being no evidence to establish a nexus between the grievance filed against Dr. Zamilus and the allegedly retaliatory conduct of Murray, summary judgment is therefore appropriate.

### III.  Conclusion

Because Plaintiff has adduced no credible, admissible evidence to support his First and Eighth Amendment claims against Defendants related to any of the treatment identified in his pleadings or moving papers, the Court declines to consider whether Plaintiff has exhausted all of his administrative remedies or whether Defendants are entitled to qualified immunity.

For the foregoing reasons, the Motion is granted. The Clerk of the Court is respectfully

requested to terminate the pending Motion (Dkt. No. 92) and close the case.

SO ORDERED.

DATED:     September 30, 2016
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

24